United States District Court
Southern District of Texas
**ENTERED**
August 17, 2020
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **RINGERS TECHNOLOGIES LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:18-CV-4347** |
| | § | |
| **GEORGE HARMER,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court are Defendant's Opposed Motion for Partial Dismissal (Dkt. No. 64), Plaintiff's Sealed Motion for Partial Summary Judgment on Defendant's Counterclaims for Inventorship, Ownership, Unenforceability, and Invalidity (Dkt. No. 69), Plaintiff's Sealed Motion for Partial Summary Judgment on Defendant's Counterclaims for Breach of Contract and Fraud (Dkt. No. 71), and Defendant's Sealed Motion for Sanctions for Spoliation of Evidence (Dkt. No. 88). The parties filed responses to each other's motions and replies in support of their own motions, as well as evidence and other exhibits. (*See* Dkt. Nos. 68, 70, 75, 92, 93, 105, 106, 107, 112, 113.)

Plaintiff filed this declaratory action on November 16, 2018, to determine the proper inventorship and/or ownership of two design patents and one design patent application and for a judgment that Plaintiff did not misappropriate Defendant's trade secrets. (*See* Dkt. No. 1 at 1.) The patents in suit relate to improvements to industrial work gloves with impact protection. (*Id.* at 4.) Defendant's live pleading is his Third Amended Answer, Affirmative Defenses, and Counterclaims, and Plaintiff filed an Amended Answer to the Counterclaims. (*See* Dkt. Nos. 37, 90.) The District Judge referred the entire case to the Magistrate Judge for full pretrial management pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Federal Rule of Civil Procedure ("Rule") 72.

(Dkt. No. 55.)

After considering the parties' briefs, the evidence and exhibits, and relevant legal authority, the Magistrate Judge recommends that the District Judge **GRANT** Defendant's Opposed Partial Motion to Dismiss; **DENY** Plaintiff's Sealed Motion for Partial Summary Judgment on Defendant's Counterclaims for Inventorship, Ownership, Unenforceability, and Invalidity; and **GRANT IN PART AND DENY IN PART** Plaintiff's Sealed Motion for Partial Summary Judgment on Defendant's Counterclaims for Breach of Contract and Fraud. Defendant's Sealed Motion for Sanctions for Spoliation of Evidence is **DENIED**.

## I. <u>Defendant's Opposed Motion for Partial Dismissal</u>

Defendant's Motion for Partial Dismissal seeks dismissal with prejudice of Counterclaim Counts I, II, and VII-XVI, which request declaratory judgments as to the inventorship and/or ownership of U.S. Patent Nos. D824,111; D843,064; D844,254; and 10,342,277 and U.S. Patent Application Nos. 15/493,925; 15/821,500; 29/619,633; and 15/938,721. As a matter of equity, Defendant also moves for dismissal with prejudice of Plaintiff's claims seeking declaratory judgment that Hardy Lim ("Lim") is the sole inventor of U.S. Patent Nos. D824,111 and 10,342,274 (formerly U.S. Patent Application No. 15/341,586). The parties have settled all early disagreements regarding Defendant's motion, leaving only the issue whether Plaintiff's claims should be dismissed with or without prejudice.

Rule 41(a)(2), allows voluntary dismissal by court order, "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Dismissal pursuant to Rule 41(a)(2) is without prejudice unless the order states otherwise. *Id.* A dismissal without prejudice is the opposite of an adjudication on the merits. *Cf. Lomax v. Ortiz-Marquez*, __ U.S. __, 140 S. Ct. 1721, 1725 (2020) (noting that a dismissal with prejudice means the same as an adjudication on the merits).

Plaintiff argues that the dismissal of Defendant's claims with prejudice moots the case and controversy concerning the inventorship of U.S. Patent Nos. D824,111 and 10,342,274 and proposes that its claims on that issue therefore be dismissed without prejudice for lack of subject matter jurisdiction. The Court views Defendant's motion as seeking concurrent and coterminous dismissals of the parties' inventorship claims related to U.S. Patent Nos. D824,111 and 10,342,274. Dismissal of Defendant's claims with prejudice prevents him from seeking an inventorship declaratory judgment against Plaintiff in the future. Therefore, to allow Plaintiff the right to reassert the claim against Defendant after he has given up the right to challenge inventorship is both unnecessary and unfair. In its discretion, the Court finds that Defendant's Counterclaim Counts I, II, and VII-XVI and Plaintiff's declaratory judgment claims related to U.S. Patent Nos. D824,111 and 10,342,274 should all be dismissed with prejudice.

## II. **Defendant's Sealed Motion for Sanctions for Spoliation of Evidence**

Defendant seeks sanctions based on Plaintiff's deletion of all emails from 2014. Defendant asks the Court to impose an adverse inference instruction that the deleted emails contained information that was unfavorable to Plaintiff and to award Defendant attorneys' fees accrued in association with the Motion for Sanctions.

### A. **Spoliation Standard**

"Spoliation of evidence is the destruction or the significant and meaningful alteration of evidence" in pending or reasonably foreseeable litigation. *Crain v. City of Selma*, 952 F.3d 634, 639 (5th Cir. 2020) (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)). Rule 37(e) authorizes courts to impose sanctions for the failure to preserve electronically stored information as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable

steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

Rule 37(e) is intended to foreclose the Court's reliance on its "inherent authority . . . to determine when certain measures should be used." Fed. R. Civ. P. 37(e), advisory committee's note, 2015 Amends. The plain language of Rule 37(e) requires a showing as to each of these elements: (1) a duty to preserve; (2) lost electronically stored information; (3) the lost information resulted from a party's failure to take reasonable steps to preserve it; and (4) the information cannot be restored or replaced through additional discovery.

Rule 37(e) is based on the common-law "duty to preserve relevant information when litigation is foreseeable." *Id.* A duty to preserve all evidence arises when a party has notice that certain evidence is relevant or when it should have known that the evidence may be relevant to litigation. *See Guzman*, 804 F.3d at 713. When the duty arises, even information subject to routine deletion may fall within the duty's reach, requiring that the deletion process be interrupted. *See* Fed. R. Civ. P. 37(e), advisory committee's note, 2015 Amends.

Rule 37(e)(2) does not require a finding of prejudice. *Id.* "This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *Id.* The imposition of adverse inference instructions is a severe measure that cannot be based on negligent or grossly negligent loss of the information. *Id.* That level of culpability can be addressed pursuant

to subsection (1). Subsection (2) requires intent to prevent the use of evidence in litigation and carries with it the inference that the lost evidence was, in fact, "unfavorable to the party that lost it." *Id.*

### B. Relevant Facts

Throughout 2014, Plaintiff's email server was GoDaddy.[1] In May 2014, Defendant encountered Plaintiff's salesperson with whom Defendant discussed a glove design that he had developed.[2] Defendant continued corresponding with Plaintiff's representatives, entered a Mutual Non-Disclosure Agreement ("NDA") with Plaintiff, and scheduled an in-person meeting in August 2014 with Lim, Plaintiff's Research and Development Director.[3] In September 2014, Plaintiff notified Defendant that it was not interested in pursuing Defendant's idea any further.[4]

In early 2018, Defendant became aware that Plaintiff had released a new glove design ("R-Chem series") that Defendant believed included one or more of his ideas that he shared with Plaintiff in 2014.[5] On May 4, 2018, Defendant emailed both Lim and Plaintiff's Chief Financial Officer ("CFO"), stating in part:

> I have not received any communication that you were going to proceed with the design that we had come up with[,] and[,] to my surprise[, ]one of my safety reps came to me last week showing off a new glove on the market by [Plaintiff] that looks substantially the same as the one we discussed in [Lim's] office in Texas. I would like someone to explain to me as to why I was not contacted as this project that we worked on together went forward to production. I wait to hear from you soon so that I can better understand why I was left out of the loop. I would appreciate receiving your response to this inquiry by no later than May 18, 2018.[6]

Plaintiff's CFO instructed Lim not to respond to Defendant's email because the CFO intended to

---

[1] *See* Dkt. No. 88-2 at 4.
[2] *See* Dkt. No. 37 at 11.
[3] *See id.*; Dkt. No. 88-8, Dkt. No. 69-1 at 212-13.
[4] *See* Dkt. No. 37 at 12.
[5] *See id.* at 12-13.
[6] *See* Dkt. No. 88-4 at 2.

address the issue with legal counsel.[7] On May 25, 2018, Lim responded to Defendant, stating that, due to associated costs, Plaintiff did not at that time and had never manufactured an "injection-molded PVC coated glove" like the one that Plaintiff proposed.[8]

On June 7, 2018, Defendant sent another email to Lim and its President in which Defendant recounted what was discussed at the August 2014 meeting and provided a chronology of all contacts between Defendant and Plaintiff from May through August 2014.[9] Defendant asserted that Plaintiff's R-Chem series glove was "based upon a design I originally provided to [Plaintiff] under the terms of the NDA" that was modified jointly by Lim and Defendant.[10] The email concluded, "Unless [Plaintiff] is prepared to recognize my contributions to the new glove design and agree to compensate me for my intellectual property contributions, I will be referring this matter to my attorneys. I would appreciate receiving your response to this email by no later than June 21, 2018."[11]

On July 10, 2018, Defendant's counsel sent a letter to Plaintiff's President ("July 10 Letter") with the following subject matter heading: "**NOTICE OF BREACH OF NON-DISCLOSURE AGREEMENT**."[12] The letter notified Plaintiff of Defendant's representation, provided an updated chronology of contacts between Defendant and Plaintiff, alleged a breach of the NDA and the improper omission of Defendant as an inventor on several patent applications, and inquired whether Plaintiff was willing to engage in negotiations as to terms of compensation for Defendant.[13] The letter also stated that, if Plaintiff was not willing to negotiate, Defendant was

---

[7] Dkt. No. 88-5 at 7.
[8] Dkt. No. 88-9 at 3.
[9] Dkt. No. 88-8.
[10] *Id.* at 3.
[11] *Id.*
[12] *See* Dkt. No. 88-9.
[13] *See id.*

prepared to undertake other actions, including initiating litigation and/or challenging the patent applications.[14] Defendant's counsel set an August 8, 2018 deadline for Plaintiff's response.[15]

Shortly after the letter reached Plaintiff, its outside counsel contacted Defendant's counsel, and, thereafter, the two communicated by email throughout August 2018.[16] On August 16, 2018, Defendant's counsel expressed surprise that Plaintiff had not yet provided a written response and referred to exploring "alternative means to go forward toward resolving this matter[,]" and Plaintiff's counsel responded by promising "a written response shortly."[17] In an email dated August 31, 2018, Plaintiff's counsel stated that Plaintiff expected to send a formal response "early next week."[18]

Plaintiff's Records Retention Policy produced in this action lacks an effective date or any indication of how it came into being.[19] Pursuant to the provisions of that Records Retention Policy, the retention period for emails was eighteen months.[20] However, the policy included the following notice near the top of the first page:

> **<u>CAUTION:</u>** A record whose retention period has expired may not be destroyed if you have received notice of any pending or potential litigation, claim, negotiation, audit, or other action involving the record; its destruction cannot occur until the completion of that action and the resolution of all issues that arise from it.[21]

In an August 23, 2018 internal email, Plaintiff's employee wrote, "I was advised that we can back-up our 2008-2014 email archive . . . currently stored on a Go[D]addy server so we don't

---

[14] *See id.* at 5-6.
[15] *See id.* at 6.
[16] *See* Dkt. No. 88-10 at 2-4.
[17] *Id.* at 3-4.
[18] *Id.* at 2.
[19] *See* Dkt. No. 88-12.
[20] *See id.* at 6.
[21] *Id.* at 2.

have to continue to pay $800/year to keep it alive."[22] It further stated, "We have until August 31 to complete this . . . . Since our email policy has changed to 18 months, we may not need to save this data."[23] A week later, Plaintiff's CFO received an internal email that suggested keeping a portion of the data and discarding the rest.[24] The CFO responded, "I have a call with legal today on this topic so please wait as we might just delete all."[25] On August 31, 2018, the CFO sent an email stating, "Please delete data. This is consistent with our document retention policy of deleting all emails greater than 18 months old."[26] The deleted data included emails of seven individuals who communicated electronically with Defendant and/or participated in internal discussions about his ideas.[27] No emails related to Plaintiff's 2014 interaction with Defendant were retained.[28]

A week later, Plaintiff's counsel responded by letter to Defendant's counsel's July 10 Letter.[29] Characterizing that letter as a "demand letter," Plaintiff's counsel stated that Plaintiff disagreed with its conclusions.[30] Plaintiff's counsel stated his understanding of the claims made by Defendant: "The Letter claims breach of a non-disclosure agreement, misappropriation, and fraud on the United States Patent and Trademark Office, all stemming from communications between [Defendant] and [Plaintiff] in May to August 2014."[31]

Since the filing of this lawsuit on November 16, 2018, Plaintiff and its counsel have taken the following positions and/or actions regarding Plaintiff's interpretation of Defendant's 2018

---

[22] Dkt. No. 88-11 at 4.
[23] *Id.*
[24] *See id.* at 2.
[25] *Id.*
[26] *Id.*
[27] *See id.* at 2-3.
[28] *See* Dkt. No. 88-2 at 8.
[29] *See* Dkt. No. 88-13 at 2.
[30] *Id.*
[31] *Id.*

communications and the production of Plaintiff's document retention policy:

**July 22, 2019--**In email communication with Defendant's counsel, Plaintiff's counsel argued that a privilege log was not necessary for communications after Plaintiff's receipt of Defendant's "pre-suit demand" because "there is no meaningful distinction between counsel communications from May 2018-November 2018 and after filing the Complaint."[32]

**September 24, 2019--**In a response to a motion to compel, Plaintiff's counsel agreed to produce Plaintiff's document retention policy in effect "at the time of receipt of [Defendant's] first demand to [Plaintiff] in May 2018."[33]

**October 3, 2019--**In a letter to the Court regarding discovery issues, Plaintiff's counsel averred that Plaintiff "implemented a document retention policy prior to this action in 2017 that did not maintain emails for longer than 18 months."[34] Plaintiff's counsel further stated that "[W]hen [the policy] was implemented, older emails were automatically deleted[,]" indicating that any internal emails related to the development of the R-Chem gloves as early as March 2014 would not have been retained under the policy.[35]

**October 15, 2019--**At Plaintiff's corporate representative's deposition, Plaintiff produced the Records Retention Policy as "a copy of a retention policy from sometime in 2017."[36] The witness testified that he was not aware of the policy until the day before his deposition when it was discovered in a folder of a former employee and that he had no knowledge concerning whether the policy was implemented, communicated to Plaintiff's employees or information technology ("IT")

---

[32] Dkt. No. 88-6 at 2 (emphasis added).
[33] Dkt. No. 47-1 at 23 (emphasis added).
[34] Dkt. No. 49 at 3.
[35] *Id.*
[36] Dkt. No. 88-2 at 5.

provider, or followed internally.[37]

**November 18, 2019**--In response to a motion to compel that questioned why certain emails from 2008-2014 were found and produced despite the alleged implementation of the Records Retention Policy, Plaintiff's counsel argued, "Simply put, employees who left [Plaintiff] before 2017 . . . were not subject to the 18-month auto-delete policy."[38]

**January 16, 2020**--At his deposition, Plaintiff's employee Casey Young ("Young") testified that he was not aware of a document retention policy until Plaintiff's CFO gave the instruction to delete the data on the GoDaddy server, which stated that deletion of all emails was consistent with Plaintiff's document retention policy.[39] Young reported that he had not seen the policy until the day before his deposition.[40] When Defendant's counsel requested a copy of the email providing the deletion instruction, Plaintiff's counsel responded that the email fit within Defendant's discovery requests to which Plaintiff had objected.[41]

**January 23, 2020**--At a discovery hearing, Plaintiff's counsel represented that all of its witnesses testified that, although they had not "physically" seen the policy, "they were aware it employees . . . was implemented before this litigation or before the first contract from [Defendant]."[42] At that hearing, the Court ordered production of the email from Plaintiff's CFO to Young instructing Young to delete the data on the GoDaddy server.[43]

**February 19, 2020**--In a letter to the Court, Plaintiff's counsel contended that the assertion that Plaintiff had an apprehension of suit in May 2018 when Defendant emailed Plaintiff "lacks

---

[37] *See id.*
[38] Dkt. No. 53 at 17.
[39] *See* Dkt. No. 88-3 at 13.
[40] *See id.* at 13-14.
[41] *See id.* at 14.
[42] Dkt. No. 73 at 23.
[43] *See id.* at 24-25.

merit."[44]

### C. Analysis

The Court begins by determining when Plaintiff's duty to preserve arose. Defendant's email dated May 4, 2018, did not overtly threaten legal action, but his grievance carried noticeable legal overtones. Plaintiff's CFO reaction in advising Lim not to respond and indicating that he intended to seek legal counsel belies Plaintiff's assertion now that it was not alerted to potential litigation by that email. A month later, Defendant's email correspondence provided much greater detail and concluded with the demand that Defendant be compensated for his contributions or he would contact his attorneys. The July 10 Letter left no doubt that litigation with Defendant was on Plaintiff's horizon. The duty to preserve evidence, including the relevant emails from 2014, arose before the deletion of email data on August 31, 2018.

Plaintiff's contention that the deletion of the emails was performed in connection with the routine enforcement of its document retention policy is not supported by the evidence. First, no evidence confirms that the Records Retention Policy was ever implemented, and, even if it had been implemented, the deletion was not in compliance with the warning on the first page. Second, no evidence demonstrates that Plaintiff had any other policy calling for routine, good faith deletion of electronic data. Third, irrespective of those voids, no evidence demonstrates that Plaintiff actually engaged in the scheduled practice of deleting emails. To the contrary, the fact that Plaintiff stored emails from 2008-2014 on a GoDaddy server is indisputable evidence that Plaintiff did not effectuate a rolling eighteen-month purge of emails. Attorney argument and shifting theories cannot fill the evidentiary void. Plaintiff's other proffered reason for deleting the 2014 emails fares no better. Through legal representation, Plaintiff argues that the deletion of the emails was a

---

[44] Dkt. No. 82 at 1.

business decision to save $800. Given Plaintiff's legal sophistication and consultations with attorneys, that is not a credible assertion. Neither excuse offered by Plaintiff negates that its duty to preserve arose before the deletion of the emails.

As it is undisputed that the emails were deleted, the second element of Rule 37(e) is met. The third element is satisfied by the evidence that Plaintiff could have retained the emails if it had transferred them to its own server. To the extent that Plaintiff claims that it acted reasonably in reliance on legal advice, the Court finds that doing so does not transform its actions into reasonable steps to preserve the information. Lastly, according to Plaintiff, it produced all relevant emails from that period that were saved in other locations. Therefore, all emails that could be restored or replaced have been. Defendant need not go as far as deposing Plaintiff's employees to test their recollections as to what relevant information was in the deleted emails. That option is neither reliable nor fair to the party who did not destroy the missing evidence. All four of the general elements are met.

Defendant's request for an adverse inference instruction is governed, however, by subsection (2). The Court must find that Plaintiff acted with "intent to deprive" Defendant of using the emails. While the timing, the ever changing account of what happened and why, and the contumacious conduct in discovery could lead to the inference that Plaintiff intentionally destroyed the emails, the Court must heed the advisory committee's instruction to use caution when imposing as severe a sanction as issuing an adverse inference instruction. Here, Plaintiff's deletion of all emails from 2008-2014 was far broader than necessary if the intent was to deprive Defendant from having access to a small number of emails sent during a few months in 2014. The only evidence that emails concerning Plaintiff's interaction with Defendant and/or its use of his ideas actually existed is in the deposition testimony of Plaintiff's employee who stated that he exchanged emails

with Plaintiff's Founder concerning a glove design drawing. To go from the existence of that email to a finding that it and others contained any relevant information that was unfavorable to Defendant is too far a leap. Although there is no doubt that Plaintiff engaged in ill-advised business practices, the factual basis for showing an "intent to deprive" is insufficient to justify an adverse inference instruction.

### III. <u>Plaintiff's Motions for Partial Summary Judgment</u>

Plaintiff filed two separate motions for partial summary judgment, one on inventorship, ownership, unenforceability, and invalidity and the other on breach of contract and fraud.

#### A. <u>Summary Judgment Standard</u>

Rule 56(a) instructs the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). The movant is tasked with the initial burden of informing the Court of the basis for the motion and pointing to relevant excerpts in evidence that demonstrate the absence of genuine factual issues. *See Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may also argue that the nonmovant failed to produce evidence in support of at least one element of a cause of action for which he bears the burden of proof. *See Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

If the movant satisfies the initial burden, it shifts to the nonmovant who must produce evidence of a genuine factual dispute; he may not merely rest on the allegations in his pleading. *See Coastal Agric. Supply, Inc.*, 759 F.3d at 505 (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In reviewing a motion for summary judgment, the Court bears the responsibility of taking the nonmovant's evidence as true and drawing all reasonable inferences in

his favor. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). But the Court should not accept "[u]nsubstantiated assertions, improbable inferences, [or] unsupported speculation" as sufficient to carry the nonmovant's burden. *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003). Any evidence not cited by the parties need not be considered by the Court, although it may consider other materials in the record. Fed. R. Civ. P. 56(a)(3).

### B. Evidence of Record

General Production Service Inc. ("GPS"), a full-service company in the oil and gas industry, hired Defendant in March 2007, and he became GPS's Safety Director about a year later.[45] In 2013, Defendant engaged in conversations with Darin Jeffries ("Jeffries"), GPS's Regulatory Compliance Officer, concerning "the need for gloves that better protected against the types of injuries and risks workers were exposed to with glove designs existing at the time" and "the need for improved glove design to not compromise dexterity for added impact protection."[46] The two discussed working together to develop better glove designs, but Jeffries was not financially able to partner with Defendant.[47]

In early 2014, Defendant worked on a GPS project that involved evaluating impact gloves used in the oil and gas industry ("Aera Glove Project").[48] The Aera Glove Project reported deficiencies in and ideas for improvement in five impact gloves including Plaintiff's R-77 polyvinyl chloride ("PVC") impact glove.[49] About the same time, Defendant engaged PRG Prototyping to produce a glove design drawing.[50] Defendant also worked to create a glove on his

---

[45] *See* Dkt. No. 92-1 at 3-4, 6.
[46] Dkt. No. 69-1 at 371.
[47] *Id.*
[48] *See id.* at 7-8; Dkt. No. 92-2.
[49] *See* Dkt. No. 92-2.
[50] *See* Dkt. 92-1 at 16; Dkt. No. 92-7; Dkt. No. 92-8.

own by attaching thermoplastic rubber ("TPR") padding to the exterior instead of the interior of a PVC glove.[51] Throughout this time, Defendant continued discussions with Jeffries about the glove designs and ideas, including showing him PRG Prototyping's drawing.[52]

In May 2014, Plaintiff's employee made a sales call to Defendant's workplace and showed Defendant the R-77 glove.[53] Defendant told the salesperson that the glove was flawed and shared an image of and information about Defendant's own design, which he asserted would work better for well-servicing operations.[54] Jeffries was present during that conversation.[55] A week later, Defendant sent Plaintiff an email proposing that they work together to improve the glove's design and suggesting that they discuss the business opportunity.[56]

On July 2, 2014, Plaintiff and Defendant executed the NDA, stating that they "intend[ed] to discuss the formation of a business relationship with each other, may form such business relationship, and may participate in business activities during such business relationship (collectively, the 'Business Purpose')."[57] The NDA acknowledged that each party might obtain "proprietary and confidential information" from the other and defined that term to include "any modifications or derivatives prepared by the [other party.]"[58] Excluded from the definition of "confidential information" was that which was "publicly known."[59] Each party agreed to use confidential information received from the other party only in connection with the Business Purpose and agreed not to disclose it except to the party's own "directors[,] officers, employees .

---

[51] *See* Dkt. No. 92-1 at 12-13.
[52] *See* Dkt. No. 69-1 at 371-72.
[53] *See id.* at 85-86, 134-35.
[54] *See id.* at 86, 136, 138.
[55] *See id.* at 372.
[56] *See id.* at 135-36.
[57] Dkt. No. 92-10 at 2.
[58] *Id.*
[59] *Id.*

. . who need to know the Confidential Information to achieve the Business Purpose[.]"[60] The NDA stated that both parties were responsible for breaches by its employees.[61] A choice of law provision in the NDA selected Delaware law.[62] By its own terms, the NDA terminated two years after the date of disclosure of confidential information.[63]

Email communications and phone conversations between Defendant and several of Plaintiff's employees ensued.[64] In July 2014 email communications with Plaintiff, Defendant stated that his glove could be manufactured in the United States using four to five fewer manufacturing steps than the current process.[65] Defendant differentiated his glove design from a photograph that Lim sent as "using the injection process and . . . the antimicrobial treated liner."[66] Defendant presented other ideas to Plaintiff as well.[67] Defendant learned through email communications that Plaintiff found the injection molding process to be expensive and the molding "hard to do" and that Plaintiff had greater knowledge about the process than Defendant.[68] Injection molding was rejected before Plaintiff's invitation to fly Defendant to Houston for an in-person meeting.[69]

In August 2014, Plaintiff's Founder emailed an image of a "red dip glove" to Young, requesting that he put Plaintiff's TPR protection design onto that template glove.[70] Specifically, Young was tasked with erasing the TPR protection on the image and "creating new concepts that

---

[60] *Id.*
[61] *See id.*
[62] *See id.*
[63] *See id.*
[64] *See* Dkt. 92-12 at 9-20.
[65] *See* Dkt. No. 69-1 at 217.
[66] Dkt. No. 69-1 at 219-20.
[67] *See* Dkt. No. 69-1 at 86-87, 145-46.
[68] Dkt. No. 92-1 at 27.
[69] *See id.*; Dkt. No. 92-12 at 7-9.
[70] Dkt. No. 69-1 at 21-22; s*ee also* Dkt. No. 69-1 at 19, 67.

included [Plaintiff's] signature impact protection."[71] On August 20, 2014, Young rendered three different versions that followed Plaintiff's method.[72]

On August 21, 2014, Defendant met with Lim.[73] They discussed the R-77 glove, the Aera Glove Project report, the shortcomings of other gloves on the market, and Defendant's design ideas.[74] Lim used a computer program to incorporate the ideas they discussed into the design of a glove.[75] Lim printed the design drawing for Defendant.[76] Both Defendant and Lim took notes at the meeting.[77] Defendant wrote:

> He really liked the new design but not sure about the diamond on top of the hand. I told him it was for dexterity but the prototype doesn't do it justice . . . We came up with some ideas to change the top of the hand impact protection. I wish I had a program like that!!! Stoked at this new design . . . Still needs more protection on top of the hand over the wrist . . . Said he would make some changes and send out later.[78]

After that meeting, Defendant had lunch with Plaintiff's President who told Defendant that Plaintiff "appreciate[d] folks that come in and give us real information from the field" and that Plaintiff compensated those who helped develop gloves by providing experiential knowledge.[79] Plaintiff's President said that he looked forward to working with Defendant and promised to compensate him based on sales if the glove design went to market.[80]

When Defendant returned to work after the meeting in Houston, he showed his supervisor

---

[71] Dkt. No. 69-1 at 59-60.
[72] *Id.* at 60.
[73] *See id.* at 147.
[74] *See* Dkt. No. 92-1 at 21-22.
[75] *See id.*
[76] *See id.* at 23.
[77] *See id.* at 21.
[78] Dkt. No. 92-16 at 24.
[79] Dkt. No. 92-1 at 26.
[80] *Id.* at 26-27.

Rusty Risi ("Risi") and Jeffries the design drawing that Defendant and Lim created.[81] Defendant emailed Lim multiple times in September following up on their meeting.[82] On September 18, 2014, Lim notified Defendant that Plaintiff would not be pursuing Defendant's idea at that time "due to [Plaintiff's] current priorities" and that Plaintiff would "revisit and review [his] idea again in the future" when Plaintiff decided it was ready "among other priorities [it had] in glove development."[83] Six months later, Defendant sent another email, stating that he noticed similar gloves to the design they had discussed were being manufactured by Plaintiff's competitors but that they were not "the best out there."[84] Defendant continued, "I know that it can be done better and you're the company that can do it."[85] He inquired whether Plaintiff might have a renewed interest in his design.[86]

No other communications between Defendant and Plaintiff are documented in the record until Defendant sent the email on May 4, 2018, asking why he had not been contacted when the "project that [they] worked on together went forward to production."[87] Lim is named as the inventor on the design patents challenged by Defendant.[88]

### C. **Analysis**

In February 2020, the Court dismissed Defendant's counterclaim counts XVII and XVIII concerning unenforceability and invalidity and his affirmative defense of invalidity.[89] The portion of the motions for partial summary judgment addressing those claims should be denied as moot.

---

[81] *See* Dkt. No. 69-1 at 372; Dkt. No. 92-18 at 3; Dkt. No. 92-19 at 3.
[82] *See* Dkt. No. 92-12 at 4, 6-7.
[83] *Id.* at 4.
[84] *Id.* at 2.
[85] *Id.*
[86] *See id.*
[87] *Id.*
[88] *See* Dkt. No. 37-12 at 2; Dkt. No. 37-13 at 2.
[89] *See* Dkt. No. 78 at 9; Dkt. No. 94.

1. *Defendant's Inventorship and Ownership Counterclaims*

Pursuant to 35 U.S.C. § 256(a) ("Section 256(a)"), an error in failing to name an inventor in an issued patent may be corrected by the issuance of a certificate making the correction upon proof of the facts and any other requirement(s) imposed by the U.S. Patent and Trademark Office. "A person who alleges that he is co-inventor of the invention claimed in an issued patent who was not listed as an inventor on the patent may bring a cause of action to correct inventorship in a district court under [Section 256]." *Vapor Point*, 832 F.3d at 1348 (quoting *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1356 n.1 (Fed. Cir. 2004)).

A patent's named inventor is presumed to be "the true and only" inventor. *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1292 (Fed. Cir. 2016) (quoting *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001)). Accordingly, the burden of proof that one is a co-inventor is met only by clear and convincing evidence. *Ruling Meng v. Ching-Wu Paul Chu*, 643 F. App'x 990, 994 (Fed. Cir. 2016).

"Conception is the touchstone of inventorship." *Acromed Corp.*, 253 F.3d at 1379 (quoting *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994)). Therefore, "[i]n order to prevail on a [Section] 256 claim, an alleged co-inventor must show that he contributed to the conception of the claimed invention and that his contribution was not insignificant in quality, when that contribution is measured against the dimension of the full invention." *Ruling Meng*, 643 F. App'x at 994 (internal quotation marks omitted) (quoting *Acromed Corp.*, 253 F.3d at 1379). However, even if an inventor's contribution was relatively minor, he must be listed on the patent. *See Vapor Point. LLC v. Moorhead*, 832 F.3d 1343, 1348-49 (Fed. Cir. 2016) (stating that an inventor who contributes "to only one claim or one aspect of one claim of a patent must be listed on that patent"). To be a co-inventor, the individual does not

need to make contributions of equal type or degree and need not work with other co-inventors at the same time or place. *See id.* at 1349.

However, the alleged co-inventor must present corroborating evidence of his contribution to support his own testimony. *Ruling Meng*, 643 F. App'x at 994 (citing *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998)). "Corroboration may take the form of contemporaneous documents prepared by the purported inventor, testimony of an independent witness, or circumstantial evidence of an independent nature concerning the inventive process." *Ethicon, Inc.*, 135 F.3d at 1461. Documents and other physical evidence that were created at the time of conception provide "the most reliable evidence of corroboration." *Sandt Tech, Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001).

Although whether the conception requirement has been met is a legal question, the answer is predicated on the "subsidiary factual finding" of corroboration, which is "fundamentally about credibility." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006) (internal quotation marks omitted). An evaluation of all pertinent evidence is required to reach a sound credibility determination as to the alleged co-inventor's account. *Ethicon, Inc.*, 135 F.3d at 1461 (quoting *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993)).

Defendant bases his claim of co-inventorship on contributions to "[t]he ornamental design for an industrial impact safety glove" claimed in two of Plaintiff's design patents (U.S. Patent Nos. D809,714 and D824,599).[90] As corroborating evidence in support of his own testimony, Defendant's response points to: (1) the printout of the design that Defendant and Lim allegedly created at their meeting on August 21, 2014; (2) Defendant's notes from the meeting; and (3) Risi's declaration that he saw the printout of the design drawing shortly after the meeting.

---

[90] Dkt. 69-1 at 232-33.

Plaintiff challenges the sufficiency of these pieces of evidence, as well as Jeffries' declaration stating that he and Defendant engaged in conversations about glove design in early 2014 and confirming the existence of the design drawing and the Aera Glove Project report. In addition, Plaintiff argues that the printout of the design drawing was not created by Defendant and Lim but, rather, was created by Young on the day before Defendant's meeting with Plaintiff.

The only piece of evidence listed above that does not provide any corroboration in support of Defendant's testimony is the Aera Glove Project report, which does not identify Defendant as an author or contributor and does not discuss any design improvements for the gloves reviewed. The dispute arising from the parties' differing accounts of when and who created the design drawing cannot be resolved on summary judgment. If the factfinder believes Defendant's account, the printout serves as reliable evidence of the design elements he contributed. Whether it alone satisfies Defendant's burden of proof is also a matter to be decided at trial. Defendant's notes from the meeting and the declarations from Risi and Jeffries are competent summary judgment evidence of when the drawing was created. Jeffries' testimony about his conversations with Defendant in early 2014, may also support Defendant's claim that he conceived of certain elements that were incorporated into the design drawing.

Plaintiff's arguments that Risi and Jeffries are biased by their relationships with Defendant and that the probative value of their accounts is diminished because of the intervening years between the events and their declarations are both challenges to their credibility. Credibility issues are factual matters resolved at trial not on summary judgment. Based on Plaintiff's reliance on Lim's deposition testimony, a fact issue exists with regard to what was discussed and what was accomplished at the meeting between him and Defendant. Defendant's evidence is sufficient to raise a fact issue for trial whether Defendant contributed to the ornamental design elements

incorporated into U.S. Patent Nos. D809,714 and D824,599 and, if so, whether his contributions were more than insignificant when measured against each patent as a whole.

Plaintiff cites *Weaver v. Houchin*, No. 4:09-CV-187-A, 2010 WL 2710604, at *3 (N.D. Tex. July 8, 2010). In that case, the District Court found that the plaintiff "failed to offer sufficient independent corroboration to support his claim of co-inventorship." *Id.* The court explained that the plaintiff's inventorship contentions each relied at least in part on his testimony and the testimony of his former co-plaintiffs, which, absent corroboration, was insufficient. *See id.* at *3-4. The court found other testimony to lack personal knowledge. *See id.* at *3. The plaintiff offered two exhibits that he asserted supported his claims of inventorship, but, in fact, that assertion contradicted his own testimony that no documents existed to evidence contemporaneous disclosure of his conception. *See id.* at *3-4. The court further found that neither piece of documentary exhibit established that the plaintiff had created the document or the concepts therein. *Id.* at *4. Because none of the evidence produced by the plaintiff satisfied the requirements for corroborating evidence as a matter of law, the plaintiff did not meet his burden on summary judgment to point to a genuine issue of material fact.

Here, in contrast, Defendant produced corroborating evidence. It is not the Court's task on summary judgment to weigh that evidence. Summary judgment should not be granted for Plaintiff on Defendant's inventorship counterclaim. Plaintiff's only challenge to Defendant's patent ownership claims is that they "rest exclusively on his inventorship claims."[91] Because summary judgment is not warranted on the inventorship counterclaims, it should not be granted on the ownership counterclaims.

---

[91] Dkt. No. 69 at 25.

2. *Defendant's Breach of Contract Counterclaim*

Delaware law requires proof of three elements to establish a breach-of-contract claim: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the [claimant]." *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)). The principle of expectation damages, as recognized under Delaware law, "is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015) (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

Plaintiff contends that Defendant's "failure to prove that he contributed to [Plaintiff's] patents means he cannot prove that [Plaintiff] used any of [Defendant's] confidential information in breach of the NDA."[92] For the reasons stated in the prior section, Plaintiff is not entitled to summary judgment on those claims and, thus, cannot succeed on that argument. In his response, Defendant identified two incidents that he alleges breached the NDA. Defendant contends that: (1) the glove image sent to Young for modifications was Defendant's PRG prototype design and occurred within the NDA's coverage period and without any commonality of Business Purpose; and (2) the patent application to which U.S. Patent No. D809,714 claims priority included design modifications to the PRG prototype design allegedly made by Young and occurred within the NDA's coverage period and without any commonality of Business Purpose.

Plaintiff argues that Defendant's PRG prototype design was publicly known before his signing the NDA because he had shown it to Risi, Jeffries, and Plaintiff's salesperson. The Court finds this to rely on an untenable interpretation of the NDA provision excluding publicly known

---

[92] Dkt. No. 71 at 13.

information from the definition of confidential information. "Publicly known" is not a term that refers to information within the knowledge of a handful of people; rather it refers to information that is in open view, available to people as a whole. Accordingly, the Court finds that Defendant's PRG prototype design was not excluded from the NDA's definition of confidential information. Plaintiff also argues that the design created by Young was not disclosed to Plaintiff by Defendant but originated with Plaintiff. Defendant's contention is that the PRG prototype design was the confidential information he provided to Plaintiff. As discussed in the prior section, a genuine dispute of material fact exists as to the design's origin drawing leading to Plaintiff's acquisition of patents. Thus, fact issues preclude a finding that Plaintiff did not breach the NDA.

Plaintiff advances an additional argument that Defendant breached first by showing the design drawing to Risi and Jeffries. However, its argument relies on the assertion that the printout was actually Young's creation, a conclusion that rests in the hands of the factfinder. Regardless, a question of fact remains whether Plaintiff breached the NDA by sharing Defendant's PRG prototype with Young for a reason not within the NDA's stated Business Purpose. If that is determined to be a breach, then it was Plaintiff who breached first.

Finally, Plaintiff argues that Defendant lacks evidence of damages. Defendant, however, seeks expectation damages. He asserts that the breach led to the commercial success of the patented 075 R-Chem glove. Had the breach(es) not occurred, Defendant "would have been in position to seek compensation for his contributions, including through royalties on the sales of products incorporating his ideas."[93] While Defendant did not submit evidence calculating those damage amounts, the damage model is not speculative under Delaware law. Therefore, summary judgment should not be granted for Plaintiff on Defendant's contract counterclaim.

---

[93] Dkt. No. 92 at 38.

### 3. *Defendant's Fraud Counterclaim*

A claim for fraud requires evidence of: (1) a material misrepresentation; (2) that the speaker knew was false or made recklessly without knowledge of its truth; (3) that was made "with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation[;]" and (4) that caused injury to the party in actively and justifiably relying on the misrepresentation. *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 89 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (quoting *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011)).

In his response, Defendant argues that Plaintiff's "continuous claim that it was only interested in [Defendant's] injection molding ideas" was "cover" to hide Plaintiff's "actual prior desire to learn and take [Defendant's] knowledge, research, experience, and ideas without any intent to compensate him."[94] However, Defendant fails to identify a specific representation conveying Plaintiff's interest in Defendant's injection molding ideas that was false or on which Defendant relied to his detriment. In fact, Defendant testified that, before his August 2014 meeting with Plaintiff, he knew that Plaintiff was not interested in the injection molding process.

The only representation Defendant identified as allegedly false at the time it was made was Plaintiff's President's promise that Plaintiff would compensate Defendant based on glove design sales if it was produced and marketed.[95] That representation, however, was made August 21, 2014, after Defendant had shared his design ideas over months of correspondence and at the earlier in-person meeting with Lim. Defendant points to no action whatsoever that he took in reliance on that representation. Therefore, summary judgment should be granted for Plaintiff on Defendant's

---

[94] Dkt. No. 92 at 40.
[95] *See* Dkt. No. 69-1 at 167-68.

fraud counterclaim.

### IV. <u>Conclusion</u>

For the foregoing reasons, the Magistrate Judge hereby recommends that the District Judge **GRANT** Defendant's Opposed Motion for Partial Dismissal; **DENY** Plaintiff's Sealed Motion for Partial Summary Judgment on Defendant's Counterclaims for Inventorship, Ownership, Unenforceability, and Invalidity; and **GRANT IN PART AND DENY IN PART** Plaintiff's Sealed Motion for Partial Summary Judgment on Defendant's Counterclaims for Breach of Contract and Fraud. Defendant's Sealed Motion for Sanctions for Spoliation of Evidence is **DENIED**.

### <u>Notice of Right to Object</u>

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas on August 17, 2020.

Sam S. Sheldon
United States Magistrate Judge